# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                             Case No. 21-CR-131

JONTE MARSHALL,

    Defendant.

## ORDER ON DEFENDANT MARSHALL'S MOTION
## TO REOPEN DETENTION HEARING

Jonte Marshall, who is detained pending trial on a four-count indictment charging him with violating 21 U.S.C. § 841(a)(1), § 841(b)(1)(A), and § 846, as well as 18 U.S.C. § 1956(h), § 1957, and § 2(a), moves to reopen his detention hearing pursuant to 18 U.S.C. § 3142(f). (Docket # 149.) The government has responded in opposition. (Docket # 153.)

## BACKGROUND

Marshall's detention hearing was held on November 14, 2022. (Docket # 70.) At the hearing, the government moved for detention arguing that Marshall posed a danger to the community, witnesses, and co-defendants and has the financial means to be a flight risk. (*Id.*) The government argued that it has a very strong case against Marshall, that Marshall was involved in the import of drugs from California to Milwaukee, that Marshall is involved in the transportation of vehicles from the West Coast containing hundreds of thousand of dollars hidden in trap compartments, that Marshall was one the largest heroin and fentanyl dealers

in the City of Milwaukee, and that substantial amounts of drugs have been recovered from properties owned by Marshall. (*Id.*)

Marshall argued for release with the conditions recommended by Pretrial Services. Marshall cited to his strong ties the community as a home and business owner and that his fiancée and children are also in the community. (*Id.*) He argued that he was not a flight risk and that his entire life is in the community, that no drugs were found in his residence, and that he has no record of violence. (*Id.*)

After considering the parties' arguments, I found that although Marshall had presented evidence sufficient to rebut the presumption of detention, consideration of the factors under § 3142(g) warranted detention. (*Id.*) I cited to the weight of the evidence against Marshall, the lengthy incarceration he faced if convicted, and the fact that he had a prior felony drug conviction. (Docket # 77).

In moving to reopen the detention hearing, Marshall argues that at his initial detention hearing, he was not privy to any of the voluminous discovery in this matter. (Docket # 149 at 4.) He argues that his subsequent review of the discovery contradicts the government's argument at the detention hearing that he is the largest heroin and fentanyl trafficker in the City of Milwaukee. (*Id.*) Specifically, Marshall points out that when law enforcement searched Marshall's residence at 1929-31 South 97th Street, they did not find any drugs, drug packaging materials, or drug proceeds in the form of U.S. currency. (*Id.* at 5.) Marshall argues that if the government's allegations are accurate, then "surely at least some evidence of such conduct would have been present." (*Id.*)

The government responds that Marshall fails to recognize that its information about the 97th Street residence was current in 2019 and that the government now believes that

Marshall is using a residence on Mill Road as a stash house for drugs and money. (Docket # 153 at 3.) The government asserts that consistent with its argument at the original detention hearing, agents have recovered close to 100 kilograms of drugs, 19 kilograms of which were fentanyl, and over $400,000 in U.S. currency from that location. (*Id.*) On this evidence, the government stands by its allegation that Marshall was the largest heroin dealer in Milwaukee. (*Id.*)

Marshall further notes that despite the government's asserted knowledge that Marshall carried a pistol on his person at all times, there is no evidence that Marshall was carrying a pistol on his person at the time of his arrest. (Docket # 149 at 5.) The government responds that Marshall was arrested at 6 a.m. in his bedroom and although he did not have a firearm physically on his person, he had a loaded firearm within his reach on the nightstand and a second loaded firearm a few feet away in his bedroom closet. (Docket # 153 at 4.) The government contends that Marshall was armed because narcotics traffickers know that large sums of money and narcotics makes them a target for other dealers, even in the suburbs of Mequon. (*Id.*)

Marshall also challenges the government's assertion that prior to some of the controlled buys, Marshall would meet with co-defendant Ward to provide her with drugs to deliver to others. (Docket # 149 at 6.) Marshall argues that the government failed to indicate that Marshall and Ward share a child and thus their encounters were more akin to co-parents meeting to discuss childcare or other family matters. (*Id.*) Moreover, he argues that agents never observed any exchanges between the two of them resembling a drug transaction. (*Id.*) The government responds that although it documented only three occasions when law enforcement physically observed Marshall and his girlfriend at the Mill Road location, the

3

government had almost constant electronic surveillance on Marshall and the electronic information placed Marshall with a co-defendant prior to two cash seizures totaling over $600,000 in U.S. currency, as well as tracking him to the Mill Road address. (Docket # 153 at 4–5.)

Marshall also challenges the government's reliance on the large amounts of drugs and money and on Marshall's fingerprints found on a box during the search of the Mill Road residence. (Docket # 149 at 6.) Marshall counters that law enforcement only saw him at the address three times, and they never saw him bring or receive any drugs at the residence. (*Id.* at 6–7.) Additionally, he notes the evidence does not show how Marshall's fingerprints got on one of the boxes found in the residence. (*Id.*)

The government responds that multiple pieces of evidence ties Marshall to the Mill Road residence. (Docket # 153 at 5.) Marshall purchased the single-family residence on or about July 23, 2020. (*Id.*) The deed is held by Blackout Investments, LLC, a shell company maintained by Marshall. (*Id.*) The closing file was obtained from Knight Barry Title and an analysis of the closing file showed Marshall owed the seller of the residence $40,856.80. (*Id.*) Email correspondence in the closing file indicated that Marshall paid the seller the entire balance owed outside of closing. (*Id.*) There were no withdrawals from Marshall's known bank accounts consistent with the purchase of the residence; thus, case agents believed that Marshall paid for the residence in cash. (*Id.*) Consistent with a stash house storage location, there was no known active account for utilities at the location since 2020 when Marshall purchased the townhouse. (*Id.*) A motor vehicle registered to Marshall was seized at the Mill Road location that had multiple kilograms of cocaine and hundreds of thousands of dollars

in the truck of the vehicle. (*Id.*) Agents tracked Marshall to this location multiple times and confirmed his presence with physical surveillance as well. (*Id.*)

Marshall also challenges the government's argument that he was responsible for transporting $508,140 in U.S. currency, which was found in a Jeep Grand Cherokee. (Docket # 149 at 7.) He asserts that there is no connection between Marshall and the Jeep. (*Id.*) Marshall also argues that the government has no evidence connecting him to the transportation of a 2005 Ford Expedition in which $100,020 was uncovered. (*Id.* at 9.) Another individual, Ramirez-Rivera, was reported as being the individual who provided the 2005 Ford Expedition to a commercial car carrier with the direction to transport the vehicle to Arizona. (*Id.*)

The government responds that the evidence clearly showed that Ramirez-Rivera and Marshall were working together to ship over a half million dollars in drug proceeds to the west coast, further supporting its position that Marshall was an individual who trafficked in large amounts of controlled substances. (Docket # 153 at 6.) Prior to the June 2020 seizure, the government identified Ramirez-Rivera as one of Marshall's possible suppliers of controlled substances. (*Id.* at 5–6.) Agents obtained GPS warrants for the locations of the phones of Ramirez-Rivera and Marshall. (*Id.* at 6.) When Ramirez-Rivera arrived in Milwaukee in August of 2020, his phone was routinely in close proximity to Marshall's phone, including at Marshall's personal residence and businesses. (*Id.*) On August 12, 2020, both men went to the trucking business on the north side of Milwaukee owned by Marshall. (*Id.*) Marshall was observed taking a photograph of a vehicle—possibly a Jeep Grand Cherokee—in the parking lot of the business. (*Id.*) Ramirez-Rivera later drove the Jeep to a nearby parking lot followed by Marshall. (*Id.*) The Jeep was eventually loaded on a

5

commercial car hauler semi-truck headed for the west coast. (*Id.*) Case agents followed the car hauler and eventually stopped and searched the Jeep and recovered over $500,000 in U.S. currency from a hidden compartment. (*Id.*) The following day, on August 13, the two men again meet under almost identical circumstances and loaded a Ford Expedition registered to Marshall onto a second car hauler. (*Id.*) Per the discovery provided to the defense, the car hauler records listed the recipient of the vehicle to be Ramirez-Rivera, but that the contact information for the vehicle listed Marshall. (*Id.*) The same telephone number agents used for the tracking warrant was listed as the contact number for Marshall. (*Id.*) Case agents again followed and stopped the car hauler and recovered over $100,000 in United States currency from a hidden compartment inside the Ford Expedition. (*Id.*)

Similarly, Marshall contends that the government's allegation that Marshall was involved in the transportation of a Nissan Cube from California to Wisconsin in which 14 kilograms of cocaine and 16 kilograms of fentanyl were uncovered is also not substantiated. (Docket # 149 at 8.) The Nissan Cube had California license plates that was listed to an unidentified individual located in San Bernadino, California. (*Id.*) Marshall asserts that the government has no evidence that links him to the Nissan Cube. (*Id.*)

The government responds that contrary to Marshall's position, the evidence does tie him to this large drug shipment. (Docket # 153 at 7.) The government argues that in June of 2021 law enforcement stopped a car hauler destined for Milwaukee carrying a Nissan Cube vehicle. (*Id.*) A search of the vehicle later recovered 30 kilograms of controlled substances—14 kilograms of cocaine and 16 kilograms of fentanyl. (*Id.*) Agents removed the drugs and replaced it with counterfeit kilograms and allowed the Nissan to travel to Milwaukee for delivery. (*Id.*) Upon its arrival in Milwaukee, the Nissan was picked up by three men who had

6

traveled from California, and the vehicle was temporarily stored at a location in Mequon. (*Id.*) Agents ultimately arrested two of the men and seized the Nissan. (*Id.*) A phone seized from the men had been in contact with the cell phone of Marshall. (*Id.*) A debrief of one of the men indicated that the drugs seized were for Marshall. (*Id.*) The cooperating witness identified a photo of Marshall and indicated that there had been prior deliveries to Marshall and the plan after delivery was for the Nissan to be loaded with one million dollars in United States currency and to be shipped back to California. (*Id.*) The cooperating witness also provided agents with an address in Mequon as a possible meet location for the drugs. (*Id.*) The address given was identified as Marshall's personal residence where he was arrested in November of 2022. (*Id.*)

Marshall also argues that the government claimed that co-defendant Hooper referred to Marshall as "Fam." (Docket # 149 at 7.) He states that on one occasion, Hooper wrote in a text message that he had to call "Fam" regarding a potential drug transaction, however, there is no indication that Marshall was ever referred to as "Fam." (*Id.*)

Marshall also takes issue with the government's argument that Blackout Investments, LLC was not legitimate, was the source for various cash deposits, and never filed tax returns. (*Id.* at 9.) Marshall counters that newly discovered evidence shows that none of the cash deposits into the bank accounts associated with Blackout Investments are in any way connected to drug proceeds. (*Id.*)

Lastly, Marshall challenges the government's allegations that he might be a flight risk because he traveled to Mexico to meet cartel members. (*Id.*) Marshall responds that he never traveled to Mexico to meet any cartel members or for any other illegal purpose; rather, his travel to Mexico consisted of family vacations on three occasions. (*Id.* at 9–10.)

7

ANALYSIS

After a defendant has been detained, a judicial officer may reopen the detention hearing if the judicial officer finds that "information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f). Assuming without deciding that Marshall has raised new facts that were not present at the original detention hearing, I will review his new arguments under the § 3142(g) factors.

The crux of Marshall's argument for reconsideration of his detention is that having now reviewed the discovery, he asserts that the government's evidence is not as strong as presented in the original detention hearing and that the discovery does not substantiate the government's assertion that he was the biggest heroin dealer in Milwaukee. Thus, he argues that he does not pose a danger to the community, nor is he a flight risk. Whether the government will be able to prove its allegations against Marshall beyond a reasonable doubt is a matter for another day and for a jury to decide. However, having closely considered Marshall's arguments, none of them, weighed alone or in combination, warrant reconsideration of the detention order. Consideration of § 3142(g)—specifically, the rebutted presumption of detention, the weight of the evidence, the nature of the alleged kilo-level drug offense, the seizure of large amounts of U.S. currency, the seizure of two loaded firearms recovered in Marshall's nightstand and closet at the time of his arrest, and Marshall's prior drug conviction—taken together, indicate a level of risk of danger to the community for which detention is warranted.

For all of these reasons, Marshall's motion to reopen his detention hearing and for pretrial release on conditions (Docket # 149) is hereby **DENIED**.

**SO ORDERED** this 5th day of October 2023, at Milwaukee, Wisconsin.

_____
NANCY JOSEPH
United States Magistrate Judge