UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

Plaintiff,

v. Case No. 21-cr-0131-bhl-3

JONTE MARHSALL,

Defendant.

---

**DECISION AND ORDER DENYING DEFENDANT'S MOTION TO WITHDRAW GUILTY PLEA**

---

On the morning of what would have been the second day of his jury trial, and after hearing the government's lengthy opening statement highlighting the evidence against him, Defendant Jonte Marshall agreed to plead guilty to a single count of possession with intent to distribute 5 kilograms or more of cocaine and 400 grams or more of fentanyl in violation of 21 U.S.C. §841(a)(1), 841(b)(1)(A), and 846. Before accepting Marshall's guilty plea, the Court placed him under oath, conducted a detailed plea colloquy, and determined that he was knowingly and voluntarily changing his plea. Now, with the imminence of trial removed, Marshall seeks to withdraw his plea under Federal Rule of Criminal Procedure 11(d)(2)(B). Marshall argues that he did not knowingly and voluntarily enter his guilty plea (despite his sworn responses during the plea colloquy and the Court's findings) and contends his attorney was constitutionally ineffective during plea negotiations. Because Marshall's arguments fail based on the record and he has not shown a sufficient "fair and just" reason to undo his guilty plea, his motion will be denied, and this case will proceed to a sentencing hearing.

## BACKGROUND

Almost four years ago, on November 8, 2022, the grand jury returned a superseding indictment against Marshall and several co-defendants, charging them with four substantial drug and money laundering offenses. (ECF No. 52.) Initially, Marshall was represented by Attorneys Anthony D. Cotton and John M. Binder of Kuchler & Cotton, S.C. Cotton appeared for Marshall

at his arraignment and initial detention hearing. (*See* ECF Nos. 58, 66–67, & 70.) Within a month, however, both attorneys withdrew from the case. (ECF Nos. 87–88.)

Marshall then hired a group of criminal defense lawyers from Chicago: Gal Pissetzky and Jennifer Snyder of Pissetzky Law and Attorney Robert J. Kerr of the Law Office of Robert Kerr, LLC. (*See* ECF Nos. 85, 86, & 89.) These lawyers represented Marshall in connection with his pretrial motions and early plea negotiations. They filed two motions on his behalf, including a motion to suppress evidence of more than 19 kilograms of fentanyl, 70 kilograms of cocaine, and $420,000 in U.S. currency that the government seized during its execution of a search warrant at a condo owned by Marshall at 11946 West Mill Road, Unit 25, Milwaukee, Wisconsin. (ECF No. 142.) They also moved for reconsideration of the magistrate judge's decision to detain Marshall pending trial. (ECF No. 149.) Both motions were denied. (ECF Nos. 173 & 155.) Counsel then asked for more time for plea negotiations. (ECF No. 178.) When discussions with the government did not bear fruit, the Court set the first trial date in this case, a two-week jury trial to begin on November 4, 2024. (ECF No. 190.)

This initial trial date fell by the wayside, however, as Attorneys Pissetzky, Snyder, and Kerr moved to withdraw. (ECF No. 196.) In their motion, counsel cited a deterioration in their attorney-client relationship with Marshall and described "irreconcilable disagreements regarding the theory of defense," a breakdown in communication, and Marshall's failure to pay agreed upon attorney's fees. (*Id.* at 1.) At an August 6, 2024 hearing that included a discussion with counsel and Marshall outside the government's presence, the Court allowed counsel to withdraw, adjourned the trial date, and gave Marshall several weeks to retain new counsel. (ECF No. 203.)

On the eve of a subsequent status conference, Attorney Aneeq Ahmad filed correspondence reporting that he and his firm were in the process of being retained to take over Marshall's defense. (ECF No. 207.) Based on this correspondence, the Court delayed the status conference to allow time for the representation to be finalized, (ECF No. 208), and, less than a week later, Attorney Ahmad filed a formal notice of appearance, (ECF No. 209). Over the next two months, the Court conducted two further counsel-only status conferences at which the government asked the Court to set a new trial date, but Attorney Ahmad requested extensions to allow him to secure discovery from his predecessor counsel. (ECF Nos. 212 & 215.) At the latter conference, held on November 8, 2024, the Court set a second trial date, with trial to begin on March 3, 2025. (ECF Nos. 215 & 216.)

The March 3, 2025 trial date also did not hold. Just a month before trial was to start, Marshall's counsel filed an unopposed motion to adjourn citing outstanding discovery issues. (ECF No. 231.) The Court granted the motion and reset the final pretrial conference at a counsel-only telephone status hearing to discuss the open discovery issues and pick another trial date. (ECF No. 232.) At that status hearing, the Court delayed trial for another five months, scheduling it to begin on August 4, 2025. (ECF No. 234.) But this trial date also did not last.

On July 11, 2025, the same day motions in limine were due, the defense requested another adjournment. (ECF No. 257.) In support of this request, Marshall's counsel cited "significant turmoil" within his law firm along with a need to complete discovery. (*Id.*) Counsel also described how the government had made a plea offer in mid-June and, despite the parties "considerable efforts" to resolve the case, his client had expressed a desire to proceed to trial. (*Id.*) At a July 17, 2025 status conference, the government described its efforts to cooperate in discovery and confirmed that all materials had now been produced. (ECF No. 261.) With discovery completed, the Court granted a further four-month adjournment and reset trial to begin November 3, 2025. (*Id.*) The Court also granted the government's request to dismiss Counts III and IV of the superseding indictment, significantly simplifying the case. (*Id.*)

The November 3, 2025 trial date also did not last. The government almost immediately requested a change to accommodate the availability of the lead prosecutor. (ECF No. 265.) The Court then reset trial to begin on December 15, 2025 and, shortly thereafter, pushed it back again to February 2, 2026. (ECF Nos. 268 & 272.)

Despite all of these previous adjournments, on January 12, 2026, Marshall filed *pro se* correspondence asking the Court to postpone the trial *again*. (ECF No. 274.) Marshall criticized his counsel for not filing motions on his behalf, including motions to suppress, for a *Franks* hearing, and for reconsideration of his pretrial detention. (*Id.*) He suggested his retained counsel was "ineffective" and, even though Attorney Ahmad had been representing him for more than 16 months, indicated for the first time that he had actually wanted to hire and work with other lawyers at the same firm. (*Id.*) Marshall also complained about not having enough time with his lawyer to prepare for trial. (*Id.*)

Over the next nine days, the parties filed a joint final pretrial report and Attorney Ahmad filed motions in limine and a response to the government's motions in limine. (ECF Nos. 277–79.) Attorney Ahmad also filed a motion to withdraw as counsel, citing Marshall's *pro se*

correspondence and a breakdown in the attorney-client relationship. (ECF No. 280.) Counsel described how his client had rejected a plea offer following a reverse proffer and their subsequent efforts to get ready for trial and work on a defense strategy. (*Id.*) He explained that over this time his relationship with Marshall had deteriorated as they debated legal strategy and the client urged the filing of questionable motions and refused to follow counsel's instructions, inhibiting efficient trial preparation. (*Id.*) He further noted that Marshall was not fulfilling his fee obligations. (*Id.*)

The government objected to the withdrawal. (ECF No. 282.) Emphasizing that it did not normally take a position on such motions, the government noted that it felt compelled to oppose the withdrawal because replacing counsel would necessitate yet another adjournment. (*Id.*) The government cited the ample time the defense had had to prepare for trial and its having had the benefit of a reverse proffer months earlier during which the government had laid out its likely witnesses and evidence. (*Id.*) Given the multiple prior adjournments, the lengthy procedural history of the case, the impact on the Court's calendar, and the burden of potentially having to coordinate and reschedule (yet again) appearances by a large number of witnesses, the government asked that the Court deny the motion and proceed with the scheduled trial. (*Id.*) To alleviate Marshall's nonpayment of fees, the government proposed that the Court appoint Attorney Ahmad under the Criminal Justice Act based on Marshall's lengthy period of pretrial incarceration and the pending forfeiture proceedings, which were tying up Marshall's assets. (*Id.*)

The Court addressed Attorney Ahmad's motion at the final pretrial conference at which both the government and Attorney Ahmad offered further argument. (ECF No. 283.) Attorney Ahmad raised an additional issue, noting that his father had been scheduled to receive medical treatment during trial. In response, the government suggested that the Court take a day off during the trial to accommodate counsel's need to attend to his father and suggested the parties might not need the full two weeks set aside for trial if they could stipulate to uncontested evidence and obviate the need to call multiple witnesses. Attorney Ahmad agreed that taking the day off was a possible solution and that the proposed stipulations made sense and would streamline trial. Counsel also expressed concern, however, that his client "did not want to stipulate to anything."

After conducting a discussion with Attorney Ahmad and Marshall outside the government's presence, the Court denied the motion to withdraw. The Court explained that the motion was not timely and that granting it would improperly delay resolution of the case, contrary to the public interest. The Court also specifically found based on its discussions with Attorney

Ahmad and Marshall that their relationship was not irretrievably broken, explaining that their disagreements largely related to legal tactics and strategy that fell within the lawyer's area of responsibility. Remarking specifically on counsel's conscientious handling of the case to date, the Court expressed confidence that Attorney Ahmad was doing his best to represent Marshall and would continue to do so through trial. The Court also agreed to take measures to address Marshall's failure to pay Attorney Ahmad's fees and ordered Attorney Ahmad appointed as CJA counsel and authorized him to secure the services of a second attorney to assist as co-counsel. (ECF Nos. 283–286.)

The trial commenced as planned on February 2, 2026 with jury selection and opening statements. Consistent with the Court's authorization, Attorney Ahmad brought Attorney Kristen Lindgren on to his trial team, and she appeared as co-counsel for Marshall. (ECF No. 300 at 4.) Before jury selection, Attorney Ahmad again moved to adjourn trial at Marshall's specific direction, expressing his client's professed concern that the case was "too rushed" and Attorney Lindgren had not had enough time to get up to speed. (*Id.* at 4–5.) The Court denied the request, finding that both sides had had ample time to prepare, that Attorney Ahmad was fully capable of trying the case on his own, and that Attorney Lindgren had indicated a readiness and ability to assist in Marshall's defense. (*Id.* at 5.)

The government then presented a lengthy opening statement in which it detailed substantial evidence of Marshall's involvement in an alleged drug conspiracy. (ECF No. 300 at 114–57.) It described Marshall as a "drug kingpin" and Milwaukee's "largest fentanyl dealer," cited evidence of multiple kilograms of both fentanyl and cocaine, and called him "the largest heroin [fentanyl] trafficker in the City of Milwaukee's history." (*Id.* at 115, 156–57.) The government profiled Marshall's orchestration of multiple drug traffickers who sold the drugs, multiple locations where drugs were stashed, and multiple vehicles that were used for transporting the drugs. It also summarized Marshall's attempts to shield himself and his activities from law enforcement. (*See id.* at 116–18.) Attorney Ahmad's opening emphasized that Marshall was a local businessman and explained that he had been duped by cartel members into assisting them with their drug operations. (*Id.* at 165.) The defense highlighted that there was no evidence showing Marshall himself selling or delivering drugs or otherwise being involved in drug activity and insisted he "didn't know what was going on." (*Id.* at 171.)

Between the openings, the defense raised issues concerning the government's introduction of evidence of certain controlled buys of drugs involving a since-deceased witness, Corey Vance, and a confidential informant. (*Id.* at 159.) The defense objected to this evidence on both hearsay and confrontation clause grounds. (*Id.* at 159–60, 162–63.) After hearing the government's response, the Court explained that it needed more information about the specific testimony at issue and took the objection under advisement. (*Id.* at 163.)

First thing the next morning, counsel asked to speak to the Court in chambers and reported that a tentative plea deal had been reached. (ECF No. 301 at 3–4.) Attorney Ahmad explained that the government's opening statement had served as another "lengthy reverse proffer" and Marshall was now "willing to accept responsibility in terms of what is mandatory." (*Id.* at 5.) The government confirmed that the parties had tentatively agreed to terms that were "similar to the contours" of previous offers, including one extended on the Friday before trial. (*Id.* at 5, 7.) On a high level, Marshall would accept responsibility for just a portion of the massive quantity of drugs found by the government and was reserving his rights and would be "free to argue" that he was not connected to large portions of the controlled substances for purposes of sentencing. (*Id.* at 8.)

The case remained on hold for more than an hour while the government revised a prior draft of the plea agreement, which the parties then discussed and signed. The Court then proceeded to consider the agreement in open court consistent with Rule 11. The Court noted it had observed Attorney Ahmad reviewing the plea agreement with his client and Attorney Ahmad affirmed that he believed Marshall could enter a knowing and voluntary guilty plea consistent with the terms of the plea agreement. (*Id.* at 8–9.) The Court then placed Marshall under oath and conducted a plea colloquy, much of which is quoted below:

> THE COURT: All right. And Mr. Ahmad, obviously we are on two day of two. And I know you've gone over some of the terms of this potential deal, and then the final deal this morning with Mr. Marshall. I saw you in the courtroom doing that. Can you confirm on the record that you have discussed with him the terms of this agreement, the substantive law that applies to him and to his sentencing, the evidence against him and the relevant sentencing issues, all of those things?
>
> MR. AHMAD: Yes, Judge, we have discussed that with him.
>
> THE COURT: And you believe he can enter a guilty plea consistent with the terms of this plea agreement this morning that would be both knowing and voluntary?
>
> MR. AHMAD: Yes.

> THE COURT: So Mr. Marshall, I am going to ask you to please stand and raise your right hand. We're going to place you under oath.
>
> Jonte Marshall, being first duly sworn to tell the truth, the whole truth, and nothing but the truth, testified as follows:
>
> DEFENDANT: Yes, I do.
>
> . . .
>
> THE COURT: Thank you. So Mr. Marshall, you've just taken an oath to tell the truth. You understand that?
>
> DEFENDANT: Yes.
>
> THE COURT: Because you've taken an oath to tell the truth, if you provide any false answers to any of my questions this morning, you open yourself up to prosecution for perjury. Do you understand that?
>
> DEFENDANT: Yes, sir.
>
> THE COURT: Also because we're here to consider a plea agreement under which you're agreeing to plead guilty to one of the charges against you, by answering my questions this morning, you're giving up your right not to incriminate yourself, and you're going to be actually admitting your guilt. Do you understand that?
>
> DEFENDANT: Yes, I do.
>
> THE COURT: And have you had a chance this morning to discuss with your counsel the terms of this plea agreement?
>
> DEFENDANT: Yes, I have, Your Honor.
>
> THE COURT: Okay. So before I can approve a plea agreement, the law puts some protections in place. I have to address you in open court. I have to ask you some questions. I have to make certain determinations. The whole point of this process is to make sure that you understand what you're getting yourself into, that you're doing all of this knowingly and voluntarily. Does that make sense?
>
> DEFENDANT: Yes, it does

(*Id.* at 8–10.)

Marshall then answered questions under oath about his background and competency to plead guilty, including that he was not taking any medications or under the influence of drugs or alcohol that might affect his ability to understand the Court's questions and answer them truthfully. (*Id.* at 10–11.) Marshall also acknowledged that he did not have any mental health issues that

might affect his ability to understand the Cout's questions and answer them truthfully. (*Id.* at 11.) The Court then inquired about Marshall's knowledge of the terms of the plea agreement, first by having him affirm his signature on the written plea agreement and his opportunity to read and discuss it with his lawyer before he signed it, during which he stated in relevant part:

> THE COURT: So I have a copy of the plea agreement. Do you have a copy?
>
> DEFENDANT: Yes, I do
>
> THE COURT: Okay. I'd like you first to turn to the last page which is page 16, which has your signature on it.
>
> DEFENDANT: Uh-huh.
>
> THE COURT: Is the top signature yours?
>
> DEFENDANT: Yes, it is.
>
> THE COURT: And did you have a chance to read this agreement and discuss it with your lawyer before you signed it?
>
> DEFENDANT: Yes, I did.
>
> THE COURT: Okay. Without getting into the specifics of your discussions with your lawyer, those are privileged. Those are between you and him, none of my business, but I would like you to confirm if you can that to the extent you had any questions about the terms of this agreement, Mr. Ahmad was able to answer those questions to your satisfaction. Is that true?
>
> DEFENDANT: Yes, sir.
>
> THE COURT: And so after having lots of discussions over the course of this case and then this morning, you had read this latest version of the agreement, you discussed it with Mr. Ahmad, and you decided to accept the deal and you signed it; is that right?
>
> DEFENDANT: Yes, sir.
>
> THE COURT: And whose decision was it to take the deal?
>
> DEFENDANT: Um, so I'm trying to think how to answer that. It was brought to me by my attorney that it would be in my best interest, and that's what made me decide to take the deal, sir.
>
> THE COURT: Ultimately, it was your decision?

DEFENDANT: Yes, it was.

THE COURT: Did anyone force you to take the deal?

DEFENDANT: No, sir.

THE COURT: Did anyone threaten you to get you to sign this agreement?

DEFENDANT: No, sir.

THE COURT: Did anyone promise you anything other than the promises that are set forth in the agreement itself to convince you to sign it?

DEFENDANT: No, sir.

(*Id.* at 12–13.)

The Court also informed and questioned Marshall about the nature of the charge to which he was pleading guilty, the elements of the offense, the factual basis of the plea agreement, his right to plead not guilty and to persist in that plea, the right to a jury trial, the right to a lawyer, the right to confront witnesses, the right against self-incrimination, and the right to call witnesses and present evidence, and his waiver of all of those rights. (*See id.* at 13–17; Fed. R. Crim. P. 11(b)(1)(G), 11(b)(3), 11(b)(1)(B)–(E). The Court advised Marshall of the maximum possible penalties, the mandatory minimum penalty, and the Court's restitution authority. (*See* ECF No. 301 at 17); Fed. R. Crim. P. 11(b)(1)(H–I), 11(b)(1)(K). The Court outlined the sentencing process. (ECF No. 301 at 18–19); Fed. R. Crim. P. 11(b)(1)(M). The Court specifically noted the terms of the waiver of appeal. (ECF No. 301 at 20–21); Fed. R. Crim. P. 11(b)(1)(N). The Court advised Marshall of the possible immigration consequences of a criminal conviction even though Marshall informed the Court that he is a United States citizen. (ECF No. 301 at 21); Fed. R. Crim. P. 11(b)(1)(O).) At defense counsel's request, the Court also advised Marshall that the applicable forfeiture would occur prior to or at the time of sentencing. (ECF No. 301 at 21–22); Fed. R. Crim. P. 11(b)(1)(J).)

After advising Marshall of all of those rights and inquiring about any outstanding concerns, the Court specifically confirmed that Marshall still wished to plead guilty:

THE COURT: So Mr. Marshall, the Court is now ready to accept your change of plea. Do you now wish to enter a guilty plea to Count 1 of the superseding indictment consistent with the terms of this plea agreement?

DEFENDANT: I do, Your Honor

The Court then accepted Marshall's guilty plea, specifically finding that it was both knowing and voluntary and that a factual basis existed for the plea:

> THE COURT: Okay. The Court will accept your change of plea, and I will approve the plea agreement. I find that Mr. Marshall has entered a guilty plea that is knowing and voluntary, that there is a factual basis for it; that he understands all of the items set forth in Federal Rule Criminal Procedure 11(b)1. The plea agreement is therefore approved, and the defendant is found guilty of Count 1 of the superseding indictment and stands convicted of that offense as of this date.

(ECF No. 301 at 22); *see also* Fed. R. Crim. P. 11(b)(2). The Court scheduled a sentencing hearing for June 8, 2026. (ECF No. 290.)

Two weeks before sentencing, on May 18, 2026, Marshall made yet another change to his retained counsel and hired Patrick T. Campbell, then of Gimbel, Reilly, Guerin & Brown, to represent him. Attorney Campbell filed a notice of appearance and immediately moved to adjourn sentencing, explaining he had been hired to file a motion to withdraw his guilty plea, but had not yet received or reviewed the case file. (ECF Nos. 291 & 292.) After the Court agreed to the adjournment, but before any motions were filed, he too withdrew and was replaced by another attorney from his firm, Nicole Masnica. Then, following further extensions, on August 10, 2026, Attorney Masnica filed the pending motion to withdraw Marshall's guilty plea. (ECF No. 304.)

After briefing, the Court held a hearing on the motion on October 21, 2026. (ECF No. 313.) The parties began by offering competing views on how to proceed. Defense counsel asked the Court to hear evidence on whether Marshall's guilty plea had been knowing and voluntary and indicated she would call several witnesses, including Defendant Marshall and his former attorneys, Aneeq Ahmad and Kirsten Lindgren, and their investigator, Jason Barber. (*Id.* at 1.) The government argued that the defense had not articulated sufficient facts to warrant an evidentiary hearing and that Marshall's motion to withdraw his plea should be denied outright. (*Id.*) The parties then agreed to a compromise proposed by the Court in which the parties would proceed by proffer and, if an aspect of the proffers raised a credibility issue material to the Court's analysis, the Court could later hear testimony to resolve that concern. (*Id.*)

Defense counsel began by formally waiving Marshall's attorney-client privilege to the extent necessary to pursue his motion. (*Id.* at 1–2.) She then noted that if called, Marshall would

testify that he had intended to hire other attorneys from Mr. Ahmad's law firm only to have those attorneys leave the firm. He would further testify that he was given only a short amount of time to review the proposed plea agreement and that it was less favorable than prior offers made to him. Marshall would also testify that counsel had received a previous oral offer that did not include a mandatory minimum and was therefore more generous than the offer he ultimately accepted. He would also state that he was not familiar with and did not understand some terms of the plea agreement and did not realize that as part of the plea agreement he was taking responsibility for approximately 112 million grams of drugs. Finally, Marshall would testify that he had agreed to the plea while under a great deal of stress and concern regarding counsel's preparation for trial and believed he was not being supported by counsel.

In response, the government argued that the Court should deny the motion outright as Marshall failed to present a fair and just reason for withdrawing his plea given the Court's detailed and thorough plea colloquy. The government further contended that the factual issues identified by the defense were irrelevant to whether Marshall's plea was knowing and voluntary. The government also insisted that it had never made an offer to Marshall without a mandatory minimum.

## LEGAL STANDARD

Federal Rule of Criminal Procedure 11(d)(2)(B) provides that a defendant may withdraw a guilty plea after it is accepted by the court but before sentencing if the defendant can demonstrate "a fair and just reason" for requesting the withdrawal. *See United States v. Mays*, 593 F.3d 603, 607 (7th Cir. 2010). Showing a "fair and just reason" is no small task. Under Seventh Circuit caselaw, a "fair and just" reason for withdrawing a guilty plea requires a showing of actual or legal innocence or that the plea was not entered knowingly and voluntarily. *Id.* at 607 (citations omitted); s*ee United States v. Graf*, 827 F.3d 581, 583 (7th Cir. 2016) (defendant who shows guilty plea was not knowing and voluntary has established a "fair and just reason" for withdrawal). A plea entered based on the ineffective assistance of counsel is not knowing and voluntary, *United States v. Smith*, 989 F.3d 575, 580 (7th Cir. 2021) (citing *Graf*, 827 F.3d at 583–84), and such a showing could therefore also provide a basis for withdrawing the plea.

The Seventh Circuit has confirmed, however, that a defendant has "no absolute right" to withdraw his guilty plea. *United States v. Collins*, 796 F.3d 828, 834 (7th Cir. 2015). The Court's acceptance of a guilty plea is a solemn matter, requiring thorough questioning of the defendant,

typically under oath, with the Court then making a series of specific factual determinations. *See* Fed. R. Civ. P. 11(b)(1). Accordingly, once a full Rule 11 colloquy has taken place, "the 'fair and just' . . . escape hatch is narrow." *Mays*, 593 F.3d at 607. The Court may reject "out of hand" a defendant's motion to withdraw his guilty plea if the basis for the withdrawal is inconsistent with the answers given during the plea colloquy, absent "a compelling explanation for the contradiction." *United States v. Peterson*, 414 F.3d 825, 827 (7th Cir. 2005).

The defendant's burden in establishing a "fair and just reason" is heavy, particularly where the record confirms the court conducted a proper Rule 11(b) colloquy. *Collins*, 796 F.3d at 834. The Court may, but need not, hold an evidentiary hearing on the motion. *United States v. Winston*, 34 F.3d 574, 578–79 (7th Cir. 1994.) A hearing is unnecessary if the motion fails to set forth a "fair and just" reason on its face, *id.*, or if the defendant fails to offer "substantial evidence" that would impugn the validity of the plea. *United States v. Jones*, 381 F.3d 615, 618 (7th Cir. 2004). Similarly, if "the allegations advanced in support of the motion are mere conclusions or inherently unreliable, the motion may be denied without a hearing." *Id.* (quoting *United States v. Redig*, 27 F.3d 277, 280 (7th Cir. 1994)).

## ANALYSIS

In his briefing and evidentiary proffer, Marshall does not articulate a coherent theory for withdrawing his plea. Instead, he relies upon a series of complaints about his former counsel, professes confusion about the terms of the plea agreement, and points to the general stress he felt about trial and his counsel's alleged preparedness. None of these things suggest that Marshall is factually or legally innocent, which are two of the primary bases for a plea withdrawal. This leaves him with the contention that he did not enter his guilty plea knowingly and voluntarily. But his arguments and proffer do not support this showing either. Accordingly, the Court concludes Marshall has not established a "fair and just" reason to disregard his plea within the meaning of Rule 11(d)(2)(B).

A fundamental obstacle to Marshall's effort is that he entered his plea following a full and detailed Rule 11 colloquy. As detailed above, Marshall agreed to plead guilty on the second day of trial, after more than three years of legal proceedings, adjournments, and plea negotiations. He had ample time to understand the charges and evidence against him and the framework of the plea deal the government proposed, which was similar to prior offers. He then stood before the Court, under oath, and admitted his guilt, following a face-to-face discussion with the Court in which he

confirmed that he had read and understood the plea deal offered before he signed the agreement. (ECF No. 301 at 9–22.) Based on his responses and, having reviewed his demeanor, the Court specifically found that Marshall was entering a guilty plea that was both knowing and voluntary, that there was a factual basis for the plea, and that he understood all of the items set forth in Federal Rule Criminal Procedure 11(b)(1). (*Id.* at 22.) Marshall does not challenge any of this or suggest the Court's colloquy was deficient in any way. Indeed, at the October 21, 2026 motion hearing, counsel conceded that Marshall did not dispute that the Court had conducted a "very detailed [plea] colloquy." This makes Marshall's request to withdraw his plea an extremely heavy lift.

As noted above, the law deems the entry of a plea of guilty a formal and solemn step, where the defendant is placed under oath and admits his guilt after detailed questioning by the Court to ensure the entry of the plea is both knowing and voluntary. *See* Fed. R. Crim. P. 11(b); *Mays*, 593 at 607 (citing *United States v. Roque-Espinoza*, 338 F.3d 724, 726 (7th Cir. 2003)) (answers to proper Rule 11 colloquy are presumed true, imposing a heavy burden on defendant and leaving the "fair and just" escape hatch "narrow"). Because the Rule 11 procedure was followed, Marshall must therefore offer a "compelling explanation" for disregarding: (1) his prior sworn answers; (2) the Court's factual findings; and (3) his resulting affirmative entry of a guilty plea to Count I of the Superseding Indictment. He has not done so.

Marshall instead offers a series of tired complaints about his attorney. He insists that when he first retained Attorney Ahmad and his law firm to replace Attorneys Pissetzky, Snyder, and Kerr in the late summer and early fall of 2024, he actually intended to hire Attorney Mindy Nolan and other attorneys affiliated with Mr. Ahmad's law firm, only to have those attorneys leave the firm and start their own practice. Marshall made similar assertions in *pro se* correspondence filed just before trial. Marshall does not explain how these intentions, even if true, could possibly render his guilty plea more than a year later unknowing or involuntary. They do not. When the Court permitted his prior lawyers to withdraw, it specifically gave Marshall nearly two months to secure replacement counsel. (ECF No. 203 at 2.) If Marshall had intended to retain Attorney Nolan or someone else in the fall of 2024, he had plenty of time to act on that intention then or in the many months that followed. But he did not do so. Attorney Ahmad remained the only retained attorney that appeared for Marshall over the next year and a half. Marshall was aware of who was representing him and had 16 months to retain different counsel. His long-ago desire to hire someone else is not a fair or just reason to withdraw his guilty plea.

Marshall also complains that he did not get enough of his retained counsel's time prior to trial to review discovery and discuss a case strategy, causing him to feel stressed as his case finally proceeded to trial. As the Court explained to Marshall at the final pretrial conference, many defendants wish they could get more of their counsel's time and attention. But the reality is that lawyers generally have multiple clients and other obligations.[1] To address Marshall's concerns about having enough attorney time devoted to his case, the Court authorized the retention of co-counsel under the Criminal Justice Act, even though most defendants proceed to trial with just a single lawyer. In his *pro se* correspondence, Marshall also complained that Attorney Ahmad had not filed all the motions Marshall wanted. But the record confirms that prior counsel had already unsuccessfully moved to suppress some of the most troubling evidence against Marshall and to revisit the issue of detention. Attorney Ahmad was justified in not seeking relief the Court had already rejected and Marshall points to no motion having any arguable merit that was not filed. Marshall's complaint about Attorney Ahmad's handling of a confrontation clause/hearsay objection ignores the record. Counsel raised the very objections that Marshall identifies, argued them well, and the Court took the issue under advisement. Marshall entered his guilty plea with those objections still outstanding. None of these *post hoc* complaints supports a finding that Marshall's agreement to plead guilty was invalid.

Marshall next criticizes Attorney Ahmad's handling of plea negotiations. Counsel's briefing makes passing reference to *Missouri v. Frye*, 566 U.S. 134 (2012), and *Lafler v. Cooper*, 566 U.S. 156 (2012), and suggests Attorney Ahmad was somehow ineffective in negotiating the deal that Marshall accepted. But the defense identifies no specific failing by trial counsel during the negotiations. Marshall's new counsel faults prior counsel for continuing to discuss a plea deal with the government once trial began. (ECF No. 304 at 5.) But a defense lawyer's decision to discuss a potential plea deal in this context—when a client is facing serious charges of the kind against Marshall—was entirely appropriate and certainly not a constitutional violation. Marshall also complains that the deal he accepted was not as good as previous offers, including an alleged oral offer that would have eliminated the mandatory minimum sentence he faces. For its part, the government vigorously disputes that any such oral offer was made. In the end, it does not matter.

[1]Attorney Ahmad also explained that Marshall was undercutting counsel's efforts at efficient trial preparation by continuing to argue about strategic matters that fell within counsel's area of responsibility and by refusing to focus on helping summarize factual issues within his own knowledge. (*See* ECF No. 280.) Marshall's failure to make effective use of his counsel's time does not provide a fair and just reason to undo his guilty plea.

Marshall does not claim that a materially better offer was made and rejected by counsel *without the client's input*, as was the case in *Frye*. The record is clear that *Marshall* himself repeatedly rejected all plea offers and directed his counsel to proceed to trial. It was only after trial began and the government made its detailed opening statement, that he finally agreed to take a plea deal. Even if the prior offers were better, that fact would hardly be surprising. Once trial began and the government had undertaken the work and expense of pretrial preparations, its plea offer is likely to be less generous. Marshall has proffered no evidence that anything about counsel's performance during plea negotiations constituted ineffective assistance sufficient to make his plea unknowing or involuntary.

Marshall next complains about the short amount of time he had to review the plea agreement. This argument also does not square with the record. Marshall specifically confirmed under oath that he had a chance to read the agreement and discuss it with his lawyer before he signed it. Attorney Ahmad confirmed the same thing and the Court specifically noted on the record that both attorney and client were seen discussing the deal in the courtroom. Marshall also acknowledged that to the extent he had any questions about the terms of the agreement his counsel was able to answer those questions to his satisfaction. And, that after having had discussions over the course of the case and the morning of the second day of trial, he had read the latest version of the plea agreement, discussed it with counsel, and then decided to accept the deal and signed the agreement. While Marshall hesitated briefly when asked whose decision it was to take the deal, citing counsel's recommendation that he take it, he then specifically confirmed to the Court that the acceptance was ultimately his decision. Nor was the drafting and signing of the plea agreement unduly rushed. Marshall had been presented with a similar version of the agreement months earlier and, after the parties informed the Court of their settlement in principle, the Court adjourned proceedings for more than an hour while the government revised the earlier draft and the parties discussed the revisions and signed the final version. Nothing Marshall has argued or proffered overcomes this clear evidence of his knowing and voluntary acceptance of the plea agreement.

Finally, Marshall claims he was confused about the terms of the agreement. But the Court reviewed the key terms with him on the record during its colloquy and he confirmed he understood them. The only specific aspect of the plea agreement that he now claims not to have understood concerns the quantity of drugs attributable to him. But this argument is also inconsistent with the record. Mashall contends he did not realize that as part of the guilty plea he was "taking

responsibility for approximately 112 million grams of drugs." (See ECF No. 310 at 5.) In the plea agreement, however, Marshall simply acknowledged that the government would make recommendations about a certain volume of drugs for purposes of calculating a base offense level and specific offense characteristics under the sentencing guidelines. This does not mean that Marshall was admitting to or joining in those recommendations. The plea agreement is clear that the "parties acknowledge and understand that the *government* will recommend . . ." (ECF No. 289 at 5–6, ¶¶17, 18, 20, & 21 (emphasis added).) Marshall only agreed to an amount of drugs sufficient to trigger the mandatory minimum sentence and was otherwise "free to argue" about the drug volumes attributable to him. As Attorney Ahmad noted, and the Court discussed with Marshall, the agreement preserved Marshall's ability to dispute "how much his involvement is" and this was an issue on which the parties expected to offer evidence and argument at sentencing. (ECF No. 301 at 4.) The government acknowledged the parties' outstanding dispute over drug weight and relevant conduct and noted that the uncontested facts demonstrated only that the drug quantity exceeded the 400 grams of fentanyl threshold. (*Id.* at 15–16.) Marshall agreed. (*Id.* at 16.) The agreement's reference to 112 million grams simply reflects a converted drug weight number pursuant to the methodology prescribed under the sentencing guidelines' methodology.

A defendant "is normally bound by the representations he makes to a court during the colloquy." *Hutchings v. United States*, 618 F.3d 693, 699 (7th Cir. 2010) (citing *United States v. Loutos*, 383 F.3d 615, 619 (7th Cir. 2004)). In other words, "[a] defendant has no legal entitlement to benefit by contradicting himself under oath. Thus when the judge credits the defendant's statements in open court, the game is over." *United States v. Stewart*, 198 F.3d 984, 987 (7th Cir. 1999) (citing *Anderson v. Bessemer City*, 470 U.S. 564, 573–74 (1985)). Marshall has pleaded guilty pursuant to a plea deal and he will be held to that deal. Marshall's contentions are not a basis for withdrawing his plea.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's motion to withdraw plea, ECF No. 304, is **DENIED**. The Court will contact the parties to reschedule Marshall's sentencing hearing.

Dated at Milwaukee, Wisconsin on November 3, 2026.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge